| | | |
|---|---|---|
| DR. G. DAVID MOSS, PH.D | ) | |
| | ) | CAUSE NO. 3:13-cv-1239 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Hon. James T. Moody |
| | ) | |
| THE UNIVERSITY OF NOTRE DAME | ) | |
| DU LAC, and ERIN HOFFMAN- | ) | |
| HARDING, Individually and in her | ) | |
| Official Capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, Dr. G. David Moss, by counsel, submits his Response to Defendants' Motion to Dismiss, as follows:

**I. Plaintiff Agrees that Defendant Hoffman-Harding is not subject to suit individually in Plaintiff's Title VII Counts I and II.**

Plaintiff has not sued Hoffman-Harding in her individual capacity under Title VII. Rather, pursuant to Plaintiff's Complaint Paragraph 12, Hoffman-Harding was only sued under Title VII as an official agent and representative of the University of Notre Dame. As such, and given that Notre Dame is subject to suit pursuant to Title VII, Plaintiff agrees that Counts I and II of his complaint do not apply to Hoffman-Harding and should be dismissed against her.

**II. Plaintiff's Count II (Title VII Retaliation Claim) Must Stand Because He Need Not Allege In An EEOC Charge Each And Every Fact That Forms The Basis Of Each Claim In His Complaint.**

Although, "[g]enerally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge," it is also true that "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 481-482 (7th Cir. 1996) (recognizing that many EEOC charges are filed by people who are unfamiliar with the procedural technicalities of discrimination law). *See also, Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir. 1971) where the court, in reasoning that a large number of the charges with the EEOC are filed by ordinary people who are unschooled in the technicalities of the law, stated, "To compel the charging party to specifically articulate in a charge filed with the Commission, the full panoply of discrimination which he may have suffered may cause the very persons Title VII was designed to protect to lose that protection because they are ignorant of or unable to thoroughly describe the discriminatory practices to which they are subjected."

On this issue, the courts provide Title VII plaintiffs with "significant leeway," (requiring only that) "all Title VII claims set forth in a complaint are cognizable that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). "The standard is a liberal one in order to effectuate the remedial purposes of Title VII." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992).

The importance of, and reasoning behind, a liberal application of these requirements was perhaps best articulated by the Seventh Circuit in *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir.1985):

> "Timely filing affords the EEOC an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party is permitted to file a lawsuit. Thus the requirement is central to Title VII's statutory scheme. Title VII, however, is a remedial statute, intended to rectify a long history of discrimination. When interpreting the statute, courts should avoid technical constructions. As a result, when appropriate, equitable considerations are available to temper the effect on litigation of the timeliness requirement. The failure to file a charge that encompasses all of the allegations in the complaint filed on the basis of the charge is very similar to the timeliness requirement. It also affords the EEOC the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts. Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge. The Supreme Court's directive that the requirement of timeliness is not strictly jurisdictional implies that the requirement of scope should be similarly interpreted…. an inquiry into the scope of the charge always entails an inquiry beyond the face of the complaint into the legal characterizations that surround the barebones of the factual allegations contained in the charge. In addition, such an inquiry may require evidence of the breadth of the EEOC investigation that followed the filing of the charge to determine whether the charge was adequate to support all of the allegations advanced in the complaint. "

Given this liberal standard, the courts have held that "different claims may be so linked… where they are so related and intertwined in time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the Act." S*itar v. Indiana Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003). For example, in *Kristufek v. Hussmann Foodservice Co., Toastmaster Div.*, 985 F.2d 364, 368 (7th Cir. 1993) the Seventh Circuit upheld the decision of the district court denying the defendant's motion to dismiss a retaliation

charge deriving from an age discrimination allegation because such a claim was "sufficiently like or related to Kristufek's claim of age discrimination which was filed with the EEOC." The court stated "that a complaint may properly encompass any discrimination like or reasonably related and growing out of charges filed with the EEOC. What boxes, for instance, are checked on the EEOC form do not necessarily control the scope of a subsequent civil complaint." *Id.*

Defendants contend that Plaintiff's Title VII claim must be dismissed because Plaintiff did not specifically allege retaliation in his E.E.O.C. charge and therefore has not exhausted his administrative remedies. However, when Plaintiff filed his E.E.O.C. charge against them on December 17, 2012, he included in a brief but detailed paragraph under the "particulars" of the charge a description of his tenure with Notre Dame, the titles he held over the course of his fourteen year tenure with the University, the name and position of his then supervisor, Defendant Erin Hoffman-Harding, and indicated that he felt he had been passed over for a promotion in favor of a less qualified white candidate on the basis of racial discrimination from the period of June 2012 to August 2012.

Plaintiff also indicated that the racial discrimination was a "continuing action" and he checked the box marked "race" under the "discrimination based on" field. Although, Plaintiff did not check the box marked "retaliation," and did not mention his demotion from Vice President to Consultant in his charge, he is not a lawyer. Plaintiff was not required to allege each and every specific fact upon which his charge was based, especially given his understanding that an EEOC investigation would ensue.

Additionally, given the very public nature of the racially motivated harassment against The Black Student Association and The African Student Association at Notre Dame in the Spring of 2012, which harassment made national news, and Plaintiff's involvement with Call to Action in shining a public spotlight on these incidents and decrying racial animosity on Notre Dame's campus, Plaintiff was unaware that a detailed description of these incidents would be needed in his charge in order to bring these issues to light in the investigation that followed.

Furthermore, these incidents are all intricately linked in "time, people, and substance." S*itar* at 726. Plaintiff alleges that he was unfairly discriminated against in his application for a promotion in the Spring/Summer of 2012 due to racially motivated bias. Plaintiff has alleged that he was passed over for this promotion by a white candidate and due to his involvement with Call to Action in speaking out against racial harassment on campus, which involvement began in the Spring 2012, shortly before he applied for the promotion at issue. Plaintiff alleges that not only was he denied a promotion on these grounds but that his demotion from Assistant Vice President to Consultant occurred as a direct result of the same. Finally, Plaintiff alleges, as he did in his EEOC charge, that the discrimination was perpetrated by Defendant Notre Dame through its agent and Officer, Erin Hoffman-Harding.

Plaintiff's E.E.O.C. charge of race discrimination was sufficient to ensure that Defendants had formal notice of a problem, which problem also encompassed retaliation. Under the circumstances, dismissing Plaintiff's retaliation charge would unfairly and improperly deprive him of the protections of Title VII, and would thwart the purposes of Title VII due to mere "[ignorance] of or [inability] to thoroughly describe the

discriminatory practices to which he was subjected." *Danner v. Phillips Petroleum, Id.* at 162.

**III. Plaintiff's Title VII Retaliation Claim (Count II) Also Stands Because Plaintiff's Actions in Opposing Racial Hostility On Notre Dame's Campus Qualify As Statutorily Protected Activity.**

The opposition clause of Title VII of the Civil Rights Act of 1964 provides, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees… because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3. The Supreme Court has recently expanded the definition of 'opposition' to include a wide range of protected conduct, including when an employee speaks out in response to, or as part of, an internal investigation, in an effort to facilitate dialogue between employees and employers about discrimination:

> "Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it "opposition" if an employee took a stand against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons….There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 277-78 (2009).

And while Plaintiff's speech dealt with racial discrimination towards students, rather than Notre Dame employees, the concept is nevertheless the same. Moreover, the

remedial purposes of Title VII would be disserved by parsing such a distinction in this case.

The scope of unlawful discriminatory conduct prohibited by Title VII is broad. The Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition 'is not limited to "economic" or "tangible" discrimination,' and that it covers more than 'terms' and 'conditions' in the narrow contractual sense. As the Court stated in Harris, the phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment… in employment..." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (internal quotations and citations omitted).

Plaintiff has alleged that he was retaliated against as a result of publicly speaking in opposition to the racial hostility and discrimination that was occurring in his work environment, to wit, the University of Notre Dame. It is of no significance that the discrimination and hostility came from students. Just as an employer who fails to alleviate sexual harassment on the factory floor is subject to charges of discrimination (and therefore, retaliation against anyone who brings or speaks up about the same), so too is Notre Dame subject to charges of retaliation for taking actions against an employee who seeks to remediate racial hostility and discrimination on the shop floor of the university, which is the student population.[1]

---

[1] This is particularly true in this case, given that it was part of Plaintiff's job responsibilities in the Office of Student Affairs to respond to and attempt to alleviate all forms of racial bias and intolerance on campus.

**IV.** **Defendants' Challenges to Plaintiff's 42 U.S.C. §§ 1981 and 1983 Claims (Counts III, IV, And V) Are Premature Because they Necessarily Entail Inquiries into Issues of Fact, not Issues of Law.**

The Defendants have prematurely raised the state actor challenge at this phase of the proceedings, and, pursuant to the very clear language of Rule 12(b)(6), their motion to dismiss Plaintiff's Counts III, IV and V should be denied. In reviewing a Rule 12(b)(6) Motion to Dismiss, the court is required to "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008).

The Seventh Circuit case *Illinois Migrant Council v. Campbell Soup Co.,* 519 F.2d 391(7th Cir. 1975) is instructive. There, the Seventh Circuit reversed the trial court's order granting a Motion to Dismiss, saying:

> The plaintiffs' complaint alleged that the Company operated a residential community for 150 persons providing them with the basic facilities needed, including a work place, residences, a store, a cafeteria and a recreational building… It would further seem reasonable to infer that [the community] must have some means of protecting itself from crime and fire, and must have some means of disposing of its sewage. In sum, in our view, the plaintiffs' complaint alleged sufficient facts upon which it could be concluded that the Campbell Soup Company's town of Prince Crossing was a company town within the meaning of Marsh v. Alabama, and accordingly when the defendant Company acted, it did so under color of state law." *Id.* at 395.

The court went on to say, "if Prince Crossing is the functional equivalent of a municipality, it may not restrict the plaintiffs' exercise of their First Amendment rights save for such reasonable and limited regulations permitted any other town." *Id*. at 396.

The courts have made it clear that the *Marsh v. Alabama*, 326 U.S. 501 (1946) analysis is fact specific. *Dunham v. Frank's Nursery & Crafts, Inc.,* 919 F.2d 1281, 1284 (7th Cir. 1990); "[I]n the final analysis, the state action determination must be based on

the specific facts and the entire context of a given case." *See also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982); the question of whether a party is a "state actor" is a "necessarily fact-bound inquiry." *See also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S. Ct. 856, 860, 6 L. Ed. 2d 45 (1961) (Only after sifting through facts can state actor determination be made). At this stage in the proceedings, the question of how many of the *Marsh* factual indices are present is not before the court. Rather, that is a question to be addressed in discovery and, if necessary, briefed at the dispositive motion phase of the case.

The Defendants point to cases that, on their facts, determined that *Marsh* did not apply to confer state actor status on a private university. For example, in *McFayden v. Duke Univ.*, 786 F. Supp. 2d 887 (M.D.N.C. 2011), there were only three factual allegations by the plaintiffs to support their state actor claim against Duke (conspiring with Durham police for warrantless raid, adopting an internal policy that convictions of the Duke lacrosse players in the case would be in Duke's best interest, and holding meetings with the Durham police). The court ruled that these allegations alone were not sufficient to confer state actor status on Duke. In contrast, Plaintiff alleges not that Notre Dame is a limited state actor under particular factual circumstances, but rather, that it is a state actor for all purposes. No court has looked at *Marsh v. Alabama* in the context of a private university and determined that this cannot be the case because the university is private.

In this sense, the issue presents the court with a matter of first impression, which merits the full panoply of discovery before it should be presented to the court. In another sense, it is not an issue of first impression at all. *Marsh v. Alabama* is still good law, and

many of the indices that made the U.S. Supreme Court declare that the private town of Chickasaw, Alabama was a state actor are properly alleged as being present at Notre Dame. Indeed, discovery could very likely reveal that there are more indices of public function and municipal governance at Notre Dame than there were at Chickasaw.

The U.S. Supreme Court did not rule that Chickasaw was a state actor because it engaged in the traditional state action of arresting a person engaged in free speech. Rather, it ruled that Chickasaw was a state actor in spite of its private ownership, precisely because it generally engaged in public functions and municipal governance. As applied to this case, the issue is not whether or not Notre Dame engaged in specific conduct that may or may not confer limited state actor status on it as a result of the conduct. Rather, the issue is whether Notre Dame, by its general conduct in engaging in municipal governance and public functions, is a state actor in spite of being privately owned. That issue is fact specific, and merits discovery. And if, after discovery, it is determined that Notre Dame is a state actor, then its actions against Plaintiff in squelching or retaliating against his speech, implicate constitutional violations for which Plaintiff's Counts III, IV and V are directed.

Finally, a finding that Defendant Notre Dame is a state actor also opens the door to personal liability for its officer and agent, Defendant Hoffman-Harding, such that dismissal of these counts against either Defendant is improper at this time.

**V. In the Alternative, Plaintiff's Facts as Alleged, Support His §§ 1981 and 1983 Claims in Counts III, IV and V Because, Taken as True, They Show that Defendant Notre Dame is a State Actor.**

In the alternative, Plaintiff also believes that his facts as alleged meet the *Marsh v. Alabama* test for when a private entity becomes a state actor in general. "To state a claim

under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir.1996).

The test for action "under the color of state law" for § 1983 purposes, is the same as the test for state action under the Fourteenth Amendment. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). A "host of facts" can bear on the determination of what constitutes state action, such as the State's exercise of coercive power over a private entity, state encouragement, government entwined in the management of the entity, or the entity taking on a public function. *Id*. The Supreme Court has set forth several tests to help evaluate the "range of circumstances" that might constitute state action. The Seventh Circuit has listed these tests as: (1) symbiotic relationship test, (2) the state command and encouragement test, (3) the joint participation doctrine and the (4) public function test. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823-24 (7th Cir. 2009).

As these tests are not exhaustive, however, courts often look to the totality of the circumstances. "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001).

Under the "public function" theory, the private entity is deemed to be a state actor "when it performs a role or function that has been traditionally the exclusive prerogative of the government." *Volling v. Antioch Rescue Squad*, 11 C 04920, 2012 WL 6021553 (N.D. Ill. Dec. 4, 2012). Only a very narrow group of functions fit this standard. *Id.* One of the functions that meets this standard is that of municipal governance. The Supreme Court first laid out this test in *Marsh v. Alabama, supra*. Under the Marsh Doctrine, "The Court noted that the town, although wholly owned by the private corporation, functioned like any other municipality, and held that First and Fourteenth Amendment guarantees extended onto the private property of this company town. Thus, whenever private property includes all the components of a town, it becomes sufficiently state-like to fulfill the state-action requirement for invoking First Amendment rights." *Illinois Migrant Council v. Campbell Soup Co.*, 574 F.2d 374, 376 (7th Cir. 1978).

The Marsh Doctrine has been applied to protect freedom of speech and ensure the availability of information to residents of private communities in §1983 claims in numerous cases. In *Velez v. Amenta,* where restrictions were placed on the ability of visitors to enter Camp Windsor in an attempt to provide supportive services to residents, the court "emphasized that ownership does not always mean absolute dominion." *Velez v. Amenta*, 370 F. Supp. 1250, 1255 (D. Conn. 1974). The *Velez* court also reasoned, "Its seven acres are well landscaped and consist of eight buildings designated as dormitories or barracks, paved streets with ample lighting, a dining hall, a chapel, a recreation hall and canteen, a general store, a well-equipped hospital staffed by nurses and doctors, administrative offices, an outdoor wooden pavilion, playing fields, parking areas, and various service buildings. Public telephones and laundry facilities are available; water

and electricity are provided by the Metropolitan District; and sewage disposal is by septic tanks." *Id.* at 1252.

The Seventh Circuit has also emphasized the equality of constitutional protections for residents of a privately owned town, saying, "if under *Marsh v. Alabama* the defendant owns and operates a community with the functional attributes of a municipality, it is not meaningful that the company has attempted to limit public access to the town; it acquires its municipal character due to the fact it is used as a permanent town by its residents, the defendant's employees." *Illinois Migrant Council v. Campbell Soup Co.*, 519 F.2d 391, 396-97 (7th Cir. 1975). "Whenever private property includes all the components of a town, it becomes sufficiently state-like to fulfill the state-action requirement for invoking First Amendment rights." *Illinois Migrant Council v. Campbell Soup Co.*, 574 F.2d 374, 376 (7th Cir. 1978).

Other cases have refused to apply Marsh only because the private entity did not meet the guidelines set forth in Marsh. "Defendant Preferred RV Resort did not perform the traditional and exclusive public function of municipal governance. *See Marsh v. Alabama, supra.* Rather, Preferred RV Resort provided an assortment of basic amenities and simple services to its paying members, all within the fenced-in confines of its private property. Plaintiffs failed to show that Preferred RV Resort had "assum[ed] ... all of the attributes of a state-created municipality" and "exercise[d] ... semi-official municipal functions as a delegate of the State." *Snowdon v. Preferred RV Resort Owners Ass'n*, 379 F. App'x 636, 637 (9th Cir. 2010). *See also Yan Sui v. 2176 Pac. Homeowners Ass'n*, 2012 WL 6632758 (C.D. Cal. Aug. 30, 2012) (following *Snowdon*).

Here, for purposes of 42 U.S.C.A.§ 1983 jurisprudence, Notre Dame, although a privately owned university, meets the requirements of a company-owned town as laid out in *Marsh v. Alabama, supra*. As such, Notre Dame is, or should be considered, a state actor governmental entity with regard to the constitutional analysis of permissible and impermissible restrictions on freedom of speech and association. Notre Dame possesses streets that run through its property and connect one municipality or subdivision to itself or another, and businesses open and accessible to the general public at virtually every corner of the campus. Notre Dame has its own police department with full arrest powers on and off campus. It has a fire department, and health center and is home to over 6,000 students for the majority of the year. It has a federal post office on campus and is the home of two federal reserve depository libraries, which are required to remain open and accessible to the public at all reasonable times. According to the University's own website, Sacred Heart Basilica is the second largest tourist attraction in the state of Indiana. Finally, Notre Dame has a code of governance and enforcement mechanisms in place not only for the University and its employees, many of whom live on campus, but also for the student residents.

Notre Dame, Indiana is not unlike Chickasaw, Alabama as that private town is described in *Marsh*, "it has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company, serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and the United States uses one of the places as a post office from which six carriers

deliver mail to the people of Chickasaw and the adjacent area. The town and the surrounding neighborhood, which can not be distinguished from the Gulf property by anyone not familiar with the property lines, are thickly settled, and according to all indications the residents use the business block as their regular shopping center." *Marsh v. Alabama, supra, at* 502-0; *See also, Velez v. Amenta*, 370 F. Supp. 1250, 1252 (D. Conn. 1974); and *Illinois Migrant Council v. Campbell Soup Co.*, 574 F.2d 374, 377 (7th Cir. 1978) ("In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation.")

## VI. Plaintiff's §§ 1981 and 1983 Claims (Count III, IV, And V) Must Stand Because A State Actor May Not Retaliate Against An Employee For Exercising His Constitutional Rights To Free Speech.

"The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions… for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). A state actor "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "Such interference with constitutional rights is impermissible. We have applied this general principle to denials of tax exemptions, unemployment benefits, and welfare payments. But, most often, we have applied the principle to denials of public

employment. We have applied the principle regardless of the public employee's contractual or other claim to a job." *Id*. at 597. (internal quotations and citations omitted).

Plaintiff was retaliated against by Defendants in his position as a Notre Dame employee for exercising his First Amendment Rights to Freedom of Speech and Association in associating with an ethnic minority group on campus and speaking out against racially discriminatory practices and a hostile environment for African American students and faculty of Notre Dame, many of whom are also residents of Notre Dame, Indiana. Defendants, as state actors, penalized Plaintiff for the exercise of his First Amendment rights and sought to inhibit his exercise of free speech and association to the detriment of its students and residents and in violation of 42 U.S.C. §§ 1981 and 1983.

## VII. Plaintiff's Complaint Establishes a *Prima Facie* Case for His § 1981 Claims in Counts III, IV, and V.

A *prima facie* case of race or ethnicity discrimination under § 1981 is predicated on the same elements as an ethnicity discrimination claim under Title VII. The Seventh Circuit has addressed and resolved this issue previously. In *Lalvani v. Cook Cnty., Illinois*, 269 F.3d 785, 789 (7th Cir. 2001), the court said, "the task of the court is to analyze these two aspects of his case together. As plaintiff, Lalvani had to produce evidence that: (1) he was a member of a protected class; (2) he was qualified for the job in question or was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably." [citing *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995)].

Similarly, with regard to retaliation claims, the Seventh Circuit provides the following guidance: "We generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981. We see no reason to apply different requirements between the statutes with regard to retaliation claims." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) aff'd, 553 U.S. 442 (2008). Accordingly, because Plaintiff has sufficiently alleged his Title VII claims against Defendant Notre Dame, he has also sufficiently alleged his 42 U.S.C. § 1981 claims against both Defendants.

## CONCLUSION

WHEREFORE, with the exception of recognizing that Plaintiff's Title VII claims do not apply to Defendant Hoffman-Harding and should be dismissed, Plaintiff respectfully asks that the Court in all other respects to deny Defendants' Motion to Dismiss.

Respectfully submitted,


/s/ Thomas M. Dixon
Thomas M. Dixon, Esq. (18611-71)
Dixon, Wright & Associates, P.C.
Attorney for Plaintiff Dr. G. David Moss, PhD
55255 Birchwood Court
Osceola, IN 46561
(574) 315-6455
(574) 675-7783 fax

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of this pleading was served upon all counsel record using the CM/ECF system, this 30th day of January, 2014.



/s/ Thomas M. Dixon